**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 2023-0014** |
| | ) | |
| **JIMMAR A. PAYNE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Daniel H. Huston, Esq.**
St. Croix, U.S.V.I.
    *For the United States*

**Lisa L. Brown Williams, Esq.**
St. Croix, U.S.V.I.
    *For Defendant*

**<u>MEMORANDUM OPINION</u>**

**Lewis, District Judge**

THIS MATTER comes before the Court on Defendant Jimmar A. Payne's "Motion to Suppress" (Dkt. No. 18), the Government's "Opposition to Motion to Suppress" (Dkt. No. 19), the supplemental briefing by the parties (Dkt. Nos. 31, 32, 33, 34), and the evidence and arguments presented at the suppression hearing. For the reasons that follow, the Court will deny Defendant's Motion to Suppress.

## I.      BACKGROUND

On July 31, 2023, the Government filed a Criminal Information against Defendant (Dkt. No. 13).[1] The Information charged Defendant with one count – knowing possession of a firearm

_____

[1] Prior to the filing of the Information, the Government commenced this action by filing a Criminal Complaint on July 18, 2023. (Dkt. No. 1).

within a distance of 1,000 feet of a school in violation of Title 18 United States Code §§ 922(q)(2)(A) and 924(a)(4).

On August 21, 2023, Defendant filed the instant Motion to Suppress, (Dkt. No. 18), which the Government opposes (Dkt. No. 19). This Court held a suppression hearing on December 5, 2023, which was followed by supplemental briefing by the parties. (Dkt. Nos. 31, 32, 33, 34). At the hearing, the Government presented the testimony of two witnesses: Police Officer Almont King and former Police Officer Nick Felicien of the Virgin Islands Police Department ("VIPD"). Defendant testified on his own behalf. The following facts emerged from the record established prior to, at, and subsequent to the suppression hearing.[2]

On January 29, 2022, at approximately 10:16 p.m., Officers King and Felicien were on patrol on the Melvin Evans Highway in the vicinity of the Ricardo Richards Elementary School. (Dkt. No. 30 at 9-10, 50-51). Officer King testified that he noticed a silver colored, two-door Honda Civic with no visible license plate mounted on the rear of the vehicle. *Id.* at 10. He then activated the blue lights on his marked police cruiser, at which point the driver of the Civic pulled over to the left side of the road. *Id.* at 9-11. Officer King testified that the basis for the traffic stop was that the Civic had no visible rear license plate. *Id.* at 11.

According to his testimony, Officer King never saw a rear license plate on the Civic during the traffic stop. *Id.* at 27-28. Although there was a license plate in the rear window of the vehicle (Government's Exhibit 2), Officer King testified that he could not see it—despite his use of headlights and a flashlight to illuminate the car—because it was very dark outside and the glass on

---

[2] The background factual discussion in this section is based on the record established at the suppression hearing and the briefing submitted by the parties, both before and after the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but not conceded or proven beyond a reasonable doubt at this stage of the litigation.

the rear window of the vehicle was heavily tinted. (Dkt. No. 30 at 11, 29-30.). Officer Felicien similarly testified that he saw no rear license plate on the vehicle, despite the police cruiser's headlights shining towards the vehicle. *Id.* at 50-51; *see also* (Government's Exhibit 1) (depicting the rear of the vehicle during the traffic stop with no visible rear license plate). On the other hand, Defendant testified that while the rear window was tinted, it wasn't as darkly tinted as the officers claimed. (Dkt. No. 30 at 85-86). Defendant further testified that it wasn't as dark outside as the officers' testimony portrayed, and that some streetlights illuminated the area around the traffic stop. *Id.* at 86.

All three witnesses testified that Officer King made initial contact with the driver, whom Officer King identified as Defendant Jimmar Payne. *Id.* at 13, 52, 70. During the initial contact, Officer Felicien stood behind Officer King, more to the rear of the vehicle. *Id.* at 26, 53. Defendant was sitting in the vehicle in the driver's seat. *See id.* at 16. Officer King asked Defendant for his driver's license, registration, and proof of insurance. *Id.* at 14, 70-71. Defendant explained that he had just brought the vehicle down from the States—so he had no insurance or registration for the vehicle—and that he didn't have his physical driver's license on him. *Id.* at 14, 70-71. Defendant testified that he showed Officer King his driver's license on his phone. *Id.* at 71. Defendant also testified that he handed Officer King the title and the bill of lading for the vehicle, as well as his insurance for the dealer license plate on the vehicle. *Id.* Officer King testified that Defendant did not show him the documents he had asked for, but acknowledged that it was possible that Defendant showed him these various documents. *Id.* at 33-36.

At this point the testimonies of the VIPD Officers and Defendant diverged. According to Officer King, while Defendant was explaining why he did not have the requested documents, Officer King began walking to the front of the vehicle. *Id.* at 34. Officer King was shining his

3

flashlight inside the car because it was dark outside. *Id.* at 15. Officer King then observed the hammer and the handle for a firearm protruding from under the driver's seat, within arm's reach of Defendant. *Id.* at 15-16, 34. Officer King was able to make his observation—despite Defendant sitting in the driver's seat—because (1) Officer King was standing towards the front of the driver's side door from which point he could see the floorboard and (2) Defendant's legs were somewhat spread open. *Id.* at 35.

Officer King further testified that after making this observation, he asked Defendant if he was in possession of a firearm, to which Defendant stated "yes." *Id.* at 18. Officer King then asked Defendant where the firearm was within the vehicle. *Id.* Defendant stated that it was under the driver's side seat. *Id.* At that point, Officer King asked Defendant to step out of the vehicle. *Id.* After Defendant stepped out of the vehicle, Officer King patted him down. *Id.* at 18. Officer King asked Defendant if he had a license to possess a firearm in the Virgin Islands. *Id.* at 18. Defendant responded that he did not. *Id.* Defendant was then placed under arrest for carrying a firearm without a license. *Id.* at 18. Officer King testified that he believed that Officer Felicien handcuffed Defendant. *Id.* at 39.

According to Officer Felicien, he was standing at a distance from the vehicle where, although he could see Officer King, he could not entirely hear what Officer King was saying to Defendant. *Id.* at 53-54. Nonetheless, while Defendant was sitting in the driver's seat, Officer Felicien heard Officer King ask Defendant if he had a license for a firearm. *Id.* at 54. Officer Felicien then heard Officer King ask Defendant to exit the vehicle. *Id.* After Defendant exited, the officers patted down Defendant then placed him under arrest. *Id.* Officer Felicien testified that Officer King handcuffed Defendant. *Id.* at 54-55.

According to Defendant, after he explained to Officer King that he didn't have his driver's license and showed Officer King the paperwork that he did have, another officer—Officer Modeste—approached from the rear of the passenger side. *Id.* at 72-73. When Officer Modeste reached the front passenger window, he shined his flashlight into the vehicle and asked Defendant if Defendant had anything illegal in the car. *Id.* at 73. Defendant responded that he did not. *Id.* at 74. Officer Modeste then repeated his question two more times, and both times Defendant responded that nothing illegal was in the car.[3] *Id.* Officer Modeste then asked Defendant to step out of the car. *Id.* After Defendant complied with the request, Officer Modeste searched the vehicle. *Id.* When Officer Modeste found the firearm, Officer Felicien handcuffed Defendant and the officers placed Defendant in the back of the police vehicle. *Id.* at 74-75.

Officer King testified that Officer Modeste was not present on the scene until after Defendant admitted that he did not have a license to possess the firearm. *Id.* at 96-97. Officer Felicien similarly testified that he and Officer King were the only officers on the scene until after Defendant's arrest. *Id.* at 62.

Outside of this sequence of events, the testimonies of the three witnesses largely aligned. The entirety of the traffic stop—from the time of the initial stop until the time Defendant was transported from the scene—lasted around 30 minutes to an hour. *Id.* at 47, 63, 76. Defendant was not advised of his *Miranda* rights until he arrived at the police station. *Id.* at 39, 63, 78-79. When Defendant was asked if he had a license for his firearm, he was not handcuffed. *Id.* at 18-19, 91. Further, throughout the entirety of the traffic stop, no police officer brandished their firearm at Defendant. *Id.* at 18, 64, 91.

---

[3] On cross-examination, Government counsel asked Defendant if, under his version of events, his statement to Officer Modeste—that he had nothing illegal in the vehicle—was a lie. (Dkt. No. 30 at 81). Defendant conceded that it was a lie. *See id.*

Defendant offers three arguments in favor of suppression. First, Defendant argues that the initial traffic stop was unlawful. (Dkt. No. 32 at 9-12). Second, even if the initial stop was lawful, Defendant maintains that police officers unlawfully extended the traffic stop. *Id.* at 13-19. Third, Defendant argues that his statements during the traffic stop were taken unlawfully. *Id.* at 19-20. In response, the Government argues that the initial traffic stop, the extension of the traffic stop, and the manner in which the VIPD Officers gathered Defendant's statements were all constitutionally permissible. (Dkt. No. 19 at 2-5; Dkt. No. 31 at 2-3).

## II.    DISCUSSION

### A.    Initial Traffic Stop

#### 1.    Applicable Legal Principles

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010) (citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)); *see also Couden v. Duffy*, 446 F.3d 483, 494 (3d Cir. 2006) ("Generally, a seizure is reasonable only where it is justified by a warrant or probable cause."). "[O]nce the defendant has established a basis for his motion, i.e., the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). Evidence obtained as a result of an unreasonable search or seizure is inadmissible at trial and must be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (requiring exclusion and suppression of evidence obtained as the result of an unlawful search and seizure).

Stopping a car and detaining its occupants constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). While the existence of probable cause justifies a traffic stop, *Whren v. United States*, 517 U.S. 806, 810 (1996), the Third Circuit has held that only a "reasonable suspicion" that criminal activity is afoot, as established in *Terry v. Ohio*, 392 U.S. 1 (1968), is necessary to justify a routine traffic stop. *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006); *see also Johnson*, 63 F.3d at 245 ("[A] stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that . . . either the vehicle or an occupant' has violated the law.") (quoting *Prouse*, 440 U.S. at 663). When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, the totality of the circumstances must be considered. *United States v. Lewis*, 672 F.3d 232, 237 (3d Cir. 2012).

Where police have directly witnessed a traffic violation, a traffic stop is a reasonable seizure under the Fourth Amendment. *See United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) ("[A] traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."); *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)) ("[T]he Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime.").

### 2.    Analysis

Defendant argues that Officer King's initial traffic stop was an unlawful seizure under the Fourth Amendment. (Dkt. No. 18 at 2). Defendant argues that, while Officer King alleges that Defendant was stopped for failure to display a license plate on the rear of his vehicle, discovery provided by the Government shows photographs of a license plate in the rear window of the

vehicle. *Id.* at 4. Defendant asserts that the "license plate [was] clearly visible in the rear window of the vehicle," and that as such, the "allegation that there was no visible license plate on the rear of [Defendant's] car is inaccurate." *Id.* at 4-5. In support of this assertion, Defendant cites his own testimony that the lighting from the headlights of the police car permitted the officers to see the license plate. (Dkt. No. 32 at 11). Thus, Defendant argues that the officers did not have reasonable suspicion to initiate the traffic stop. (*See* Dkt. No. 18 at 4-5). Nonetheless, Defendant concedes that, if the Court credits the testimony of Officer King and Officer Felicien—as opposed to Defendant's testimony—probable cause existed for the stop. (Dkt. No. 32 at 12).

The Government argues that the traffic stop was based on reasonable suspicion that a traffic violation had occurred. (Dkt. No. 19 at 2). The Government explains that, under 20 V.I.C. § 334(a), license plates must be clearly visible from the front and rear of the vehicle.[4] *Id.* at 3. The Government acknowledges that Defendant did, in fact, have a license plate affixed to his rear window during the traffic stop. *See id.* at 2-3; *see also* (Government's Exhibit 2). Nonetheless, the Government asserts that this license plate was not clearly visible to the VIPD officers at night, when the traffic stop was initiated. *Id.* at 2-3. In support of this assertion, the Government cites (1) the testimony of Officers King and Felicien regarding the poor visibility outside, (2) testimony from both Officer King and Defendant himself that Defendant's rear window was tinted and (3) Government's Exhibit 1 depicting the poor visibility at the scene of the traffic stop. (Dkt. No. 33 at 2).

---

[4] The Government initially asserted that Defendant Payne committed a traffic violation merely by placing his license plate on the rear window of his vehicle. (Dkt. No. 19 at 3). However, during the suppression hearing, the Government abandoned this argument, and thus the Court will not consider it here. (Dkt. No. 30 at 118).

Pursuant to 20 V.I.C. § 334(a), "[o]ne [license] plate must be affixed to the front of the body of the vehicle and the other to the rear, and both plates must be clearly visible from the front and rear of the vehicle." The parties do not dispute that Defendant's vehicle did in fact have a license plate affixed to the rear window. But this is not the only requirement of Section 334(a)—the rear license plate needed to be "clearly visible."

The Court received conflicting testimony from the witnesses regarding the visibility of the license plate. As such, it must make credibility determinations. *See United States v. Luke*, No. CR 2021-0011, 2022 WL 4379430, at *10 (D.V.I. Sept. 21, 2022); *see also United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (quoting *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993)) ("It is settled that at a hearing on a motion to suppress, 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.'"). The Court judges credibility by considering a number of factors, including:

> [T]he witness's demeanor and manner on the stand, his ability to accurately recollect the matters at hand, the manner in which he may be affected by the outcome, the extent to which his testimony is either supported or contradicted by other evidence and testimony in the case, and whether it withstands the 'common sense test.'

*United States v. Johnston*, No. CR 2018-0018, 2022 WL 2982461, at *7 (D.V.I. July 27, 2022) (quoting *United States v. Davis*, Criminal No. 2:13-cr-00068, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014)).

Here, the Court credits the testimony of Officer King and Officer Felicien regarding the visibility of Defendant's rear license plate. First, the officers each had a calm and collected demeanor during their testimony, even during cross-examination. *See Luke*, 2022 WL 4379430, at *11 (finding testimony credible, in part, because the witnesses were "calm and collected" and

"withstood cross-examination"); *see also* (Dkt. No. 32 at 11) (wherein Defendant concedes that Officer King was "calm and collected" during his testimony).

Second, the relevant portions of Officer King and Officer Felicien's testimonies were consistent with each other. *See Luke*, 2022 WL 4379430, at *10 (crediting testimony of multiple police officers, in part, because "the chronology and sequence of events to which each officer testified was largely consistent across the testimonies."). Specifically, both officers testified to a nearly identical sequence of events leading up to the traffic stop. This included neither officer's ability—even with the aid of their police cruiser's headlights—to observe any license plate on the back of Defendant's vehicle.

Third, the evidence presented at the hearing supported the officers' testimony. A photograph of the rear of Defendant's vehicle following the traffic stop shows no visible rear license plate. (*See* Government's Exhibit 1).

Lastly, the "common sense test" supports the officers' version of events. The traffic stop occurred at 10:16 p.m. Defendant's rear license plate was affixed to a windshield that Defendant himself conceded was tinted. No evidence has been presented that there was any light whatsoever coming from Defendant's car that could illuminate the rear license plate. As such, common sense suggests that Defendant's rear license plate would not be clearly visible at the time of the traffic stop.

Conversely, the Court does not find Defendant's testimony regarding the visibility of the license plate to be credible. Defendant testified that it was not as dark outside as the officers had suggested, and that his rear window was not tinted as darkly as the officers had suggested. However, Defendant's testimony regarding the visibility at the scene is clearly contradicted by Government's Exhibit 1, showing Defendant's car at the traffic stop with no visible rear license

plate. The Court also notes that the officers—who were outside of Defendant's vehicle—would have a better view of the visibility of the rear license plate than Defendant, who was seated inside his vehicle.

Accordingly, the Court credits both Officer King and Officer Felicien's testimony that they did not see any license plate in Defendant's rear window at the time of the stop. In view of the foregoing, and in light of the requirement that vehicles in the Virgin Islands have a "clearly visible" rear license plate, the Court finds that the VIPD Officers had reasonable suspicion that Defendant committed a traffic violation. As such, the initial traffic stop was constitutionally permissible.

**B.      Extension of Traffic Stop**

**1.      Applicable Legal Principles**

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Moreover, "the Fourth Amendment allows an officer to conduct unrelated investigations that do not lengthen a roadside detention." *United States v. Garner*, 961 F.3d 264, 269 (3d Cir. 2020). However, a "traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission [of addressing the traffic violation]." *Rodriguez*, 575 U.S. at 354-55; *see also United States v. Nisbett*, No. CR 2016-0011, 2017 WL 125015, at *4 (D.V.I. Jan. 11, 2017) (quoting *Rodriguez*, 575 U.S. at 354) ("Because a traffic stop may last no longer than is necessary for the purpose of the stop, '[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'").

An officers' mission during a traffic stop includes "determining whether to issue a traffic ticket," as well as inquiries ordinarily incident to the traffic stop such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the

automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. "*Rodriguez* also permits the use of 'certain negligibly burdensome precautions' when done to complete the mission safely." *United States v. Hunter*, 88 F.4th 221, 224-25 (3d Cir. 2023), *cert. denied*, 144 S. Ct. 858 (2024) (quoting *Rodriguez*, 575 U.S. at 356). A traffic stop may only be prolonged or extended beyond this mission if the officer develops "reasonable suspicion" of criminal activity. *Rodriguez*, 575 U.S. at 355; *see also United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) ("An unreasonable extension occurs when an officer, without reasonable suspicion, diverts from a stop's traffic-based purpose to investigate other crimes."); *Hunter*, 88 F.4th at 225 ("Off-mission detours that do not address the basis for the stop or legitimate safety concerns, such as a dog-sniff or extensive criminal history questioning, violate the Fourth Amendment when performed without reasonable suspicion.").

The Third Circuit applies a two-step inquiry to determine whether a traffic stop was unreasonably extended under *Rodriguez. United States v. Stewart*, 92 F.4th 461, 467 (3d Cir. 2024); *United States v. Latorre-Cacho*, No. 23-2351, 2024 WL 1991462, at *2 (3d Cir. May 6, 2024). First, the Court must "determine the moment when the stop was measurably extended." *Stewart*, 92 F.4th at 467. This is known as the "*Rodriguez* moment." *Id.* Second, the Court must "determine whether the facts available to the officer up to that [*Rodriguez*] moment established reasonable suspicion of criminal activity." *Id.* "The extension of the traffic stop is lawful only if, at the time of the extension, the officer already had reasonable suspicion." *Id.*

### 2.    Analysis

Defendant argues that the VIPD officers unlawfully extended his traffic stop beyond the *Rodriguez* moment. (Dkt. No. 34 at 2). Defendant asserts that, here, the *Rodriguez* moment occurred *after* Defendant gave Officer King the documents he had regarding his vehicle and *before*

Officer King moved closer to the front panel of the vehicle. *Id.* Defendant argues that, while the documents he provided to Officer King may not have been what Officer King requested, Officer King's investigation of the basis of the traffic stop nonetheless concluded immediately after Defendant handed Officer King his documents. *Id.* at 1-2. As such, Defendant argues that when Officer King subsequently moved away from the driver's window to the front quarter panel of the driver's side and shined his flashlight into the driver's seat, he measurably extended the stop beyond the *Rodriguez* moment. *Id.* at 2. Further, Defendant asserts that nothing in the record shows that Officer King observed anything suspicious or inappropriate in Defendant's behavior that would establish reasonable suspicion up to the *Rodriguez* moment. (Dkt. No. 32 at 18-19).

The Government argues that Defendant's traffic stop was not impermissibly extended. (Dkt. No. 31 at 2). The Government maintains that the mission of the traffic stop was not complete when Officer King observed the firearm under the driver's seat. *Id.* Specifically, the Government argues that, at the time that Officer King observed the gun, (1) Defendant had still failed to provide Officer King the documentation he had requested and (2) Officer King had yet to address Defendant's failure to display a visible license plate—the basis for the traffic stop. *Id.* at 2-3. As such, the Government argues that the traffic stop was not impermissibly extended beyond its initial purpose. (Dkt. No. 33 at 3).

The parties do not dispute that Officer King ultimately extended the traffic stop of Defendant beyond its initial purpose.[5] As such, the Court must apply the *Stewart* two-step inquiry to determine the legality of such extension.

---

[5] The Court acknowledges that Defendant testified to an alternate series of events regarding how the VIPD Officers came to discover his firearm. However, in his various briefings on the Motion to Suppress, Defendant has not relied on his testimony to this effect in support of any of his legal arguments. As such, the Court likewise will not rely on this portion of Defendant's testimony in considering his arguments.

### a. The *Rodriguez* Moment

First, under the *Stewart* two-step analysis, the Court must determine the point at which the traffic stop was measurably extended—the *Rodriguez* moment. This moment occurs "when tasks tied to the traffic stop are completed or reasonably should have been completed." *Garner*, 961 F.3d at 270. In *Garner*, the Third Circuit offered guidance on what these tasks ordinarily are:

> So what tasks ordinarily are tied to the mission of a traffic stop? They include: checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. We have also held that some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop.

*Id.* at 271 (internal citations and quotations omitted) (finding that the earliest possible *Rodriguez* moment occurred when the officer began asking the driver about "his employment, family, criminal history, and other conduct unrelated to the traffic stop."). Safety-related precautions are within the mission of the traffic stop so long as they remain "negligibly burdensome." *Hunter*, 88 F.4th at 224-25 (quoting *Rodriguez*, 575 U.S. at 356); *see also United States v. Mendez*, No. 5:22-CR-40091, 2024 WL 836960, at *6 (D. Kan. Feb. 28, 2024) ("[B]ecause traffic stops are especially fraught with danger to police officers, law enforcement personnel may take certain negligibly burdensome precautions in order to complete their mission safely. These may include conducting criminal record checks, searching for outstanding warrants, or asking limited questions directed at ensuring officer safety.").

However, a police officer can measurably extend a traffic stop even if the officer has not completed every traffic-stop related task. The *Rodriguez* moment occurs "when an officer no longer pursues the tasks tied to the traffic stop even though he reasonably could have continued with those tasks." *Garner*, 961 F.3d at 270; *see also Green*, 897 F.3d at 181-82 (assuming the *Rodriguez* moment occurred when the officer paused the traffic stop—returning to his own

vehicle—to make a phone call to a colleague regarding his suspicion that the driver of the vehicle was engaged in drug trafficking); *United States v. Hurtt*, 31 F.4th 152, 161-63 (3d Cir. 2022) (finding the *Rodriguez* moment occurred when the officer paused his field sobriety investigation to provide cover for his partner, who had entered the vehicle for purposes apparently unrelated to the field sobriety investigation).

Defendant proposes that the *Rodriguez* moment occurred immediately after he handed Officer King the title and bill of lading for the vehicle, his insurance for the license plate on the vehicle, and a picture of his driver's license on his phone. This interaction was initiated when Officer King asked Defendant for his driver's license, registration, and proof of insurance. Defendant then gave Officer King the documents that he had—although they were not the documents that Officer King requested. Defendant explained to Officer King that he did not have the requested documents because he was a licensed car dealer who had just brought the vehicle down from the States. Defendant asserts that the *Rodriguez* moment occurred here—after he explained to Officer King why he did not have the requested documents and before Officer King moved closer to the front panel of the vehicle and looked inside Defendant's car with his flashlight. *See* (Dkt. No. 34 at 1-2). The Court disagrees.

At the moment when Officer King moved closer to the front panel of the vehicle and looked inside Defendant's vehicle with his flashlight, Officer King was pursuing "tasks ordinarily [] tied to the mission of a traffic stop." *Garner*, 961 F.3d at 271. Officer King had asked Defendant for his driver's license, registration and insurance—an ordinary traffic stop task. *See id.* at 270; *Rodriguez*, 575 U.S. at 355. Despite this request, Defendant had not given Officer King these documents and Officer King had not yet addressed Defendant's explanation for his failure to produce the appropriate documents. *See United States v. Bolling*, No. CR 2:21-00087, 2023 WL

5660283, at *7 (S.D.W. Va. Aug. 31, 2023) (concluding that the defendant's "failure to produce the requested documentation" warranted an extension of the traffic stop mission beyond this point); *United States v. Samms*, No. 3:22-CR-130, 2023 WL 386819, at *8 (D. Conn. Jan. 25, 2023) (finding that the traffic stop mission was ongoing at the point where the officers observed contraband in the vehicle because the driver had not yet provided his driver's license as requested).

Further, the viewing by Officer King of the inside of Defendant's vehicle with his flashlight during this interaction was not a "diversion" from the traffic stop mission. *Green*, 897 F.3d at 181-82. Rather, this was a "negligibly burdensome" safety precaution, *Hunter*, 88 F.4th at 224-25, and thus within the mission of the traffic stop. *See United States v. Wright*, No. 4:21 CR 161, 2022 WL 16757448, at *6 (E.D. Mo. Nov. 8, 2022) (determining that the officer's actions, including inspecting the vehicle with a flashlight during his conversation with the occupants of the vehicle, were rationally related to the mission of the traffic stop); *United States v. Warren*, 984 F.3d 1301, 1304-05 (8th Cir. 2021) (same); *see also United States v. Sanchez*, No. CR 19-28, 2020 WL 2404783, at *4 (D. Del. May 12, 2020), *aff'd*, 860 F. App'x 253 (3d Cir. 2021) (finding that a traffic stop was not unlawfully prolonged under *Rodriguez* where the officer inspected the defendant's vehicle with the his flashlight prior to engaging in conversation with the defendant). Accordingly, at the moment when Officer King moved closer to the front panel of the vehicle and looked inside Defendant's vehicle with his flashlight, Officer King had not deviated from the ongoing traffic stop mission. Therefore, this was not the *Rodriguez* moment.

The next possible *Rodriguez* moment occurred when Officer King—after observing a firearm underneath Defendant's seat—asked Defendant if he was in possession of a firearm. The Government does not argue that the traffic stop mission extended beyond this point. Moreover, it appears that it was at this moment—*at the earliest*—where Officer King deviated from his traffic

16

stop mission into a more serious criminal investigation regarding the legality of the firearm. *See Garner*, 961 F.3d at 271 (determining that the earliest possible Rodriguez moment occurred when the officer began asking the defendant about "conduct unrelated to the traffic stop"); *see also United States v. Barrera*, No. 3:22-CR-25, 2023 WL 3480893, at *4 (M.D. Pa. May 16, 2023) (defining the *Rodriguez* moment as the moment the officer's actions "deviated to an off-mission task of beginning a drug trafficking investigation"). Thus, the Court concludes that the earliest possible *Rodriguez* moment was when Officer King began questioning Defendant about the firearm.[6]

### b. Reasonable Suspicion

The second portion of the *Stewart* two-step analysis requires the Court to determine whether Officer King possessed reasonable suspicion of criminal activity at the *Rodriguez* moment. "Reasonable suspicion is more than 'a mere hunch but considerably less than a preponderance of the evidence, and obviously less than probable cause.'" *Green*, 897 F.3d at 183 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014) (cleaned up). As such, reasonable suspicion exists when a police officer has 'a particularized and objective basis' for suspecting . . . criminal activity . . . ." *Green*, 897 F.3d at 183 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *see also Stewart*, 92 F.4th at 468 (quoting *United States v. McCants*, 952 F.3d 416,

---

[6] The Court's ruling in this regard does not foreclose the possibility that the *Rodriguez* moment occurred at some point *after* Officer King observed the firearm and began questioning Defendant about it. It may be the case that Officer King's initial questions—regarding the existence and location of the firearm—along with Officer King's order for Defendant to exit the vehicle represent the type of "negligibly burdensome" safety precautions that are ordinarily incident to a traffic stop mission. *See Hunter*, 88 F.4th at 224-25. However, the Court does not need to reach the issue of determining the *exact Rodriguez* moment because it has found that Officer King had reasonable suspicion of criminal activity prior to the earliest possible *Rodriguez* moment identified in the text above. *See Green*, 897 F.3d at 179 (instructing courts to "err on the side of caution and assume the earlier of the two plausible '*Rodriguez* moments' from which to assess reasonable suspicion.").

422 (3d Cir. 2020)) (explaining that, in the *Rodriguez* context, the appropriate inquiry is "'whether a reasonable, trained officer standing in the officer's shoes could articulate specific reasons justifying' the extension of the stop.").

"In evaluating reasonable suspicion, courts 'must consider the totality of the circumstances—the whole picture.'" *United States v. Mcintosh*, No. CR 2016-0020, 2017 WL 216697, at *3 (D.V.I. Jan. 17, 2017) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). While "a criminal defendant [may] provide[] a 'plausible, innocent explanation' for 'each arguably suspicious factor' on its own, that does not defeat the inference of reasonable suspicion derived from the cumulative effect of available information." *Stewart*, 92 F.4th at 468 (quoting *Green*, 897 F.3d at 183). Further, the totality of the circumstances analysis must account for "the particular ability of law enforcement officers, based on training and experience, 'to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *Green*, 897 F.3d at 183 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The circumstances present here suggest that a reasonable officer in Officer King's position would have had reasonable suspicion of criminal activity at the moment Officer King began questioning Defendant regarding the firearm. Most notably, Officer King observed a partially concealed firearm in the vehicle underneath Defendant's seat. *See United States v. Brown*, No. 21-CR-20236, 2022 WL 1690157, at *6-7 (E.D. Mich. May 26, 2022) (finding that the officers' observation of a partially concealed tactical flashlight—which is a part of a gun—created a reasonable suspicion of criminal activity warranting an extension of the traffic stop); *see also United States v. Gantt*, No. 20-CR-2020, 2020 WL 6821020, at *11 (N.D. Iowa Sept. 2, 2020), *report and recommendation adopted*, No. 20-CR-2020, 2020 WL 5653983 (N.D. Iowa Sept. 23,

2020) (explaining that the traffic stop was not unreasonably prolonged because the officer had observed facts in the vehicle that allowed him to draw a reasonable inference that the driver was hiding a firearm); *United States v. Miller*, No. 419CR362, 2019 WL 8012670, at \*3 (E.D. Mo. Dec. 4, 2019), *report and recommendation adopted*, No. 4:19 CR 362, 2020 WL 64373 (E.D. Mo. Jan. 7, 2020) (same); *United States v. Anderson*, No. 1:21-CR-00089, 2022 WL 3646033, at \*17 (D. Idaho Aug. 24, 2022) (same). Officer King's observation of the partially concealed firearm created the necessary "particularized and objective basis for suspecting [Defendant] of criminal activity," *Ornelas*, 517 U.S. at 696 (cleaned up), that warrants a finding of reasonable suspicion. The Court therefore concludes that Officer King had the necessary reasonable suspicion to extend the traffic stop at the earliest possible *Rodriguez* moment.[7]

Accordingly, the Court finds that, at the moment that Officer King began to question Defendant regarding the firearm, there was reasonable suspicion that Defendant was engaged in criminal activity. Therefore, Officer King's extension of the traffic stop—to investigate this potential criminal activity—was constitutionally permissible.

### C.   **Defendant's Statements**

#### 1.   *Miranda* **Legal Principles**

The Fifth Amendment to the United States Constitution provides: "No person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. The

---

[7] The Court concludes that Officer King's observation of the partially concealed firearm warrants a finding of reasonable suspicion. The Court notes, however, that other factors present here could also contribute to a finding of reasonable suspicion. Defendant failed to provide the documentation requested by Officer King. *See Bolling*, 2023 WL 5660283, at \*7 (finding that the defendant's failure to provide the documentation requested by the police officer at the beginning of the traffic stop contributed to the officers' reasonable suspicion of criminal activity, warranting an extension of the stop). Further, Defendant was travelling in a car with "heavily tinted" windshields. (Dkt. No. 30 at 28-29); *see Stewart*, 92 F.4th at 469 (finding that the "dark window tinting" of the defendant's vehicle contributed to the reasonable suspicion necessary to prolong the stop).

Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not

use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

against self-incrimination." *Id.* at 444. The "procedural safeguards"—commonly known as

*Miranda* warnings—require that a suspect be advised prior to questioning that:

> [H]e has the right to remain silent, that anything he says can be used against him in
> a court of law, that he has the right to the presence of an attorney, and that if he
> cannot afford an attorney one will be appointed for him prior to any questioning if
> he so desires.

*Alston v. Redman*, 34 F.3d 1237, 1242 (3d Cir. 1994) (quoting *Miranda*, 384 U.S. at 479).

*Miranda*'s holding is based on a recognition "that interrogation in certain custodial

circumstances is inherently coercive," and suspects must therefore be "specifically informed of

[their] *Miranda* rights and freely decide[] to forgo those rights" to ensure that the right against

compulsory self-incrimination is preserved. *New York v. Quarles*, 467 U.S. 649, 654 (1984).

*Miranda* warnings are required whenever a suspect has been (i) "taken into custody" and (ii)

subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir.

1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion). Because

the defendant must be both in custody and subject to an interrogation to trigger *Miranda* warnings,

"in the absence of one or the other, *Miranda* is not implicated." *Gov't of Virgin Islands v.

Christopher*, 990 F. Supp. 391, 393-94 (D.V.I. 1997).

The first step of the *Miranda* analysis is to determine whether the defendant was in custody.

When making such a determination, "the initial step is to ascertain whether, in light of the objective

circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty

to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal

citations and quotations omitted). However, "[n]ot all restraints on freedom of movement amount

20

to custody for purposes of *Miranda*." *Id.* For an individual to be in custody, they "must also be subject to 'the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Ludwikowski*, 944 F.3d 123, 134 (3d Cir. 2019) (quoting *Howes*, 565 U.S. at 509).

The second step of the *Miranda* analysis is to determine whether the defendant has been subject to an interrogation by the Government. An "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

"When the police fail to give adequate *Miranda* warnings . . . any statement made by the individual who is subject to custodial interrogation is inadmissible at trial." *United States v. Brooks*, 358 F. Supp. 3d 440, 476 (W.D. Pa. 2018) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)).

### 2.    *Miranda* **Analysis**

Defendant argues that his statements during the traffic stop were taken in violation of *Miranda*. (Dkt. No. 18 at 5). Defendant asserts that he was in custody when he made his statements to Officer King, explaining that a reasonable person in Defendant's position would not have believed they were free to leave during the traffic stop. *Id.* at 7. Specifically, Defendant identifies the moment he was asked to step out of the car as the moment where he entered custody for purposes of *Miranda*. (Dkt. No. 32 at 19-20). Defendant also asserts that Officer King's questioning constituted an interrogation. (Dkt. No. 18 at 8). As Defendant was not read—and did not knowingly and intentionally waive—his *Miranda* rights prior to Officer King's questioning, Defendant argues that his statements must be suppressed pursuant to *Miranda*. *Id.* at 8-9.

The Government concedes that Officer King's questioning constituted an interrogation but asserts that Defendant was *not* in custody when the questioning occurred. (Dkt. No. 19 at 4-5); (Dkt. No. 33 at 3). In support of this conclusion, the Government asserts that Defendant gave all of his statements before he was handcuffed and that officers never displayed firearms during their encounter with Defendant. (Dkt. No. 19 at 5). Accordingly, the Government maintains that in the absence of a *custodial* interrogation, no *Miranda* violation occurred. *Id.*; *see Christopher*, 990 F. Supp. at 393-94 (explaining that *Miranda* is only implicated when there is *both* an interrogation and custody).

The Supreme Court has recognized that "a traffic stop significantly curtails the 'freedom of action' of the driver and the passengers," and that as such, few motorists "would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Howes*, 565 U.S. at 510 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 436 (1984)). However, this is not the end of the analysis. *See Ludwikowski*, 944 F.3d at 133-34 ("[C]onstraints on freedom of movement are a necessary but not sufficient condition of custody."). An individual is only in custody if they are subject to the same type of "coercive pressures" that are present during a station house interview. *See Howes*, 565 U.S. at 509. And as the Supreme Court has explained, "the questioning of a motorist subjected to a brief traffic stop" is often "worlds away" from creating such coercive pressures. *See id.* at 510; *see also Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop . . . does not constitute *Miranda* custody.").

This does not mean that a motorist subject to a traffic stop is never "in custody" for *Miranda* purposes. "[I]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he is entitled to the full

panoply of protections prescribed by *Miranda*." *Berkemer*, 468 U.S. at 440. For example, an officer's application of handcuffs to a motorist can contribute to a finding that the motorist is "in custody." *See United States v. Woodley*, No. CR 2020-0004, 2021 WL 1082225, at *7-9 (D.V.I. Mar. 20, 2021) (finding that the defendant-motorist was in custody during his interrogation because the officer handcuffed him while initiating the interrogation). Other factors that can contribute to a finding of custody during a traffic stop include an officer's display of firearms or an officer's issuance of orders physically restricting the motorist's movements outside of his vehicle. *See United States v. Rose*, 189 F. Supp. 3d 528, 540 (D.V.I. 2016). ("Drawing and aiming weapons at St. Rose, while either ordering him to raise his hands or to get on the ground, and possibly even applying handcuffs, are actions that go far beyond the degree of restraint associated with typical traffic stops.").

The coercive pressures present during Defendant's traffic stop fall short of the threshold required to render him "in custody" for *Miranda* purposes. At the time of Officer King's questioning, both Officer King and Defendant testified that Defendant was not in handcuffs. Defendant and both officers testified that no police officer on the scene brandished their firearm at any point during the encounter. Moreover, Defendant himself concedes that "the officers did not . . . use hostile tones of voice or threaten [him]." (Dkt. No. 32 at 20). These factors indicate that Defendant was not subject to the type of coercive pressures facing the motorists in *Woodley* and *Rose*.

Rather, the circumstances of Defendant's traffic stop are analogous to those discussed in *United States v. Venner*, No. CR 2015-0040, 2016 WL 8730170 (D.V.I. May 6, 2016). In *Venner*, the defendant-motorist argued that he was in custody for *Miranda* purposes during his traffic stop because "he was stopped at night in a poorly lit area; there was no evidence that other traffic was

23

around; there were two officers standing nearby when he was questioned; and he was standing in between [his vehicle] and the unmarked police car (which the record shows were about a car length apart)." *Id.* at *7. This Court found these arguments unpersuasive, explaining that:

> The record shows that the questioning of Defendant was brief, and that during the questioning Detective Walcott was using a normal tone of voice, was standing about two to three feet in front of Defendant, and his firearm remained holstered. Moreover, when Defendant was questioned and he provided responses, he was not handcuffed or physically restrained in any way. . . .
>
> The facts Defendant highlights are insufficient to indicate that a reasonable person in Defendant's situation would have felt restrained to the degree associated with a formal arrest, especially in light of the countervailing factors noted above. Noticeably absent are any facts showing that Defendant was subjected to the type of 'inherently coercive pressures' that would render him in custody. Nor do the facts highlighted by Defendant otherwise suggest a forceful, overbearing or threatening atmosphere, or any type of restraint to the degree associated with a formal arrest. Here, the questioning was brief and conducted in a normal tone of voice; Detective Walcott never drew his weapon; and Defendant, who was not handcuffed, was standing behind his [vehicle].

*Id.* (internal citations omitted). As such, the Court found that the defendant was not in custody during his traffic stop.

Much like the traffic stop in *Venner*, the circumstances of Defendant's traffic stop—at the time of Officer King's interrogation—did not render Defendant in custody for *Miranda* purposes. Certainly, some pressures were present during Defendant's traffic stop. The stop occurred at night in a location where Officer King himself testified that "the lighting was pretty bad." (Dkt. No. 30 at 11). In addition, Defendant was alone with the two officers standing in the vicinity. But some level of pressure is present during every traffic stop. *See Berkemer*, 468 U.S. at 438. ("To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions."). And each of these circumstances present at Defendant's traffic stop were present in *Venner*, where this Court found that the coercive pressures did not rise

to the level of rendering the defendant in custody for *Miranda* purposes because—as with Defendant's traffic stop—the police officers did not draw their weapons, did not handcuff the defendant, and questioned the defendant only briefly without using threatening tones of voice.

Defendant maintains that he was in custody during his traffic stop because, unlike the defendant in *Venner* who voluntarily left his vehicle, Defendant was ordered to exit his vehicle.[8] But this order alone did not elevate the coercive pressures present at the traffic stop such that Defendant was rendered in custody. *See United States v. Cole*, No. 1:09-CR-412, 2010 WL 3211027, at *11 (N.D. Ga. May 12, 2010), *report and recommendation adopted*, No. 1:09-CR-0412, 2010 WL 3210963 (N.D. Ga. Aug. 11, 2010) (finding, in a traffic stop that occurred at night, that "[t]he fact that Officer McNure asked [the defendant-motorist] to exit the vehicle does not alone convert a stop into a custodial situation."); *United States v. Day*, No. 1:05CR460, 2006 WL 306644, at *5 (E.D. Va. Feb. 8, 2006) (finding, in the context of a nighttime traffic stop where the defendant-motorist was ordered to exit his vehicle prior to making his statements, that the defendant was not in custody for *Miranda* purposes when he made such statements).

---

[8] Defendant also appears to argue that the length of the traffic stop—which he describes as "30 minutes to an hour"—contributed to the pressures that, in Defendant's view, rendered him in custody for *Miranda* purposes when he made his statements to Officer King. (Dkt. No. 32 at 20). However, while the entire traffic stop—from the time of the initial stop *until the moment that Defendant was transported from the scene*—lasted about 30 minutes to an hour, (Dkt. No. 30 at 47, 63, 76), Officer King's interrogation consisted of only four questions: (1) the initial question regarding Defendant's documentation; (2) the question regarding the existence of the firearm; (3) the question regarding the location of the firearm; and (4) the question regarding the license for the firearm. *Id.* at 13-18. This is the exact number of questions that the officers in *Venner* asked the defendant-motorist in their interrogation, *Venner*, 2016 WL 8730170, at *2, which the Court described as "brief" questioning. *Id.* at 7. As such, the Court does not find that the overall length of the traffic stop bears in any significant way on the custody issue.

As Defendant was not in custody during Officer King's interrogation at the traffic stop, "the circumstances here were not of the nature to trigger the protections of *Miranda*." *Venner*, 2016 WL 8730170, at \*8. Accordingly, this interrogation did not violate the *Miranda* doctrine.

### 3.    Fifth Amendment Voluntariness

Defendant also argues that his statements were the product of the VIPD officers' coercive activity—not freely given—and thus must be suppressed as involuntary under the Due Process Clause of the Fifth Amendment. (Dkt. No. 18 at 9-10). The Government disputes that Defendant's statements were involuntary. (Dkt. No. 19 at 5).

"[W]here a defendant challenges the voluntariness of a statement under the Due Process Clause of the Fifth Amendment, the government retains the burden of proving, 'by a preponderance of the evidence, that a challenged statement was voluntary.'" *United States v. Henry*, No. CR 2017-0001, 2018 WL 6840149, at \*10 (D.V.I. Dec. 31, 2018) (quoting *United States v. Jacobs*, 431 F.3d 99, 108 (2005)). This requires the government to demonstrate that the statement was "the product of an essentially free and unconstrained choice." *Ludwikowski*, 944 F.3d at 135 (quoting *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994)). Courts must consider "the totality of the circumstances" in the voluntariness analysis. *Id.* (quoting *U.S. ex rel. Hayward v. Johnson*, 508 F.2d 322, 326 (3d Cir. 1975)). "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary," and thus not admissible into evidence under the Due Process Clause of the Fifth Amendment. *Jacobs*, 431 F.3d at 108.

"In 'special circumstances,' a confession might be involuntary even if the person giving it is not in custody." *Ludwikowski*, 944 F.3d at 135 (quoting *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976)). However, a confession will not be found involuntary unless "it was the product of

'police overreaching.'" *Swint*, 15 F.3d at 289 (quoting *Colorado v. Connelly,* 479 U.S. 157, 164 (1986)); *see also Jacobs*, 431 F.3d at 108 ("A necessary predicate to a finding of involuntariness is coercive police activity.")

The Third Circuit has offered guidance on what factors courts should consider in determining whether police overreaching occurred during an interrogation:

> We consider the officers' tactics, including the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep. We also consider the defendant's characteristics, including his youth; his lack of education or his low intelligence; the lack of any advice of his constitutional rights, and his background and experience, including prior dealings with the criminal justice system. All these factors assist in answering the ultimate question: whether the defendant's will was overborne when he confessed.

*Ludwikowski*, 944 F.3d at 135 (internal citations and quotation marks omitted). "Examples of coercive tactics include prolonged, multi-hour interrogations, threats of physical violence, and deprivation of food or water during detention." *United States v. Taylor*, No. 20-CR-443-1, 2022 WL 3030524 at *10 (E.D. Pa. July 29, 2022) (citing *Connelly,* 479 U.S. at 163–64 & n.1 (1986)).

Here, the totality of the circumstances suggests that no police overreaching occurred during Defendant's traffic stop. Defendant himself describes the entire traffic stop as lasting 30 minutes to an hour, (Dkt. No. 32 at 20), far short of the multi-hour interrogations that can constitute police overreaching. Officer King asked Defendant a mere four questions during the entirety of the traffic stop and Defendant gave his statements before he was handcuffed. At no point did officers brandish their weapons. Further, Defendant has asserted nothing about his background or experiences that would make him uniquely susceptible to any coercion associated with routine police behavior during a traffic stop—which is not generally considered coercive. *See Taylor,* 2022 WL 3030524 at *10 (finding no evidence of coercive activity sufficient to overcome the defendant's will during a traffic stop where the defendant was handcuffed and ordered to lay on the ground).

Thus, the Court finds that Defendant's free will was not overborne when he made his statements to Officer King. As such, his statements were not involuntary under the Fifth Amendment.

*     *     *

Having concluded that Officer King's interrogation of Defendant did not violate Defendant's *Miranda* rights or otherwise violate the Fifth Amendment of the Constitution, the Court will not suppress Defendant's statements.

### III.    CONCLUSION

In view of all of the foregoing, Defendant Jimmar Payne's Motion to Suppress will be denied.

An appropriate Order accompanies this Memorandum Opinion.

Date: May 30, 2024                    _____/s/_____
                                      WILMA A. LEWIS
                                      District Judge